```
                 IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
                      FORT WORTH DIVISION
```

| | |
|---|---|
| UNITED STATES OF AMERICA, | )   **Case No. 4:23-mj-00476-BP** |
| | )   **(Merged into 4:23-cr-217-O)** |
|        Plaintiff, | ) |
| | )   Fort Worth, Texas |
| v. | )   June 23, 2023 |
| | )   10:00 a.m. |
| ELIJAH MUHAMMAD (01), | ) |
| CIARA DAVENPORT (03), | )   PRELIMINARY HEARING |
| | )   DETENTION HEARING |
|        Defendants. | ) |

```
                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE JEFFREY L. CURETON,
                 UNITED STATES MAGISTRATE JUDGE.
```

APPEARANCES:

For the Government:          Brandie Lou Wade
UNITED STATES ATTORNEY'S OFFICE
801 Cherry Street
Burnett Plaza, Suite 1700, Unit 4
Fort Worth, TX  76102-6882
(817) 252-5200

For Defendant Muhammad:     Roderick Christopher White
LAW OFFICES OF RODERICK C. WHITE
316 Hemphill Street
Fort Worth, TX  76104
(817) 335-1585

For Defendant Davenport:    Mark R. Danielson
LAW OFFICE OF MARK R. DANIELSON
990 Highway 287 North,
  Suite 106-171
Mansfield, TX  76063
(817) 845-3790

For U.S. Probation and      Molly Mouret
Pretrial Services:

Court Recorder:            Julie Harwell
UNITED STATES DISTRICT COURT
510 W. 10th Street
Fort Worth, TX  76102
(817) 850-6697

```
1    Transcription Service:      Kathy Rehling
                                 311 Paradise Cove
2                                Shady Shores, TX  76208
                                 (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
            Proceedings recorded by electronic sound recording;
25            transcript produced by transcription service.
```

| | |
|---|---|
| 1 | FORT WORTH, TEXAS - JUNE 23, 2023 - 9:53 A.M. |
| 2 | THE COURT:  Is that how you pronounce it? |
| 3 | DEFENDANT DAVENPORT:  Yes. |
| 4 | THE COURT:  Ciara Davenport. |
| 5 | Ms. Brandie Wade is present for the Government.  Is the |
| 6 | Government ready to proceed? |
| 7 | MS. WADE:  We are, Your Honor. |
| 8 | THE COURT:  Mr. Roderick White on behalf of Defendant |
| 9 | Muhammad.  Is the Defense ready to proceed? |
| 10 | MR. WHITE:  Yes, Your Honor. |
| 11 | THE COURT:  And Mr. Danielson, what says the Defense |
| 12 | as to Ms. Davenport? |
| 13 | MR. DANIELSON:  We're ready to proceed, Your Honor. |
| 14 | THE COURT:  All right.  You may proceed.  Call your |
| 15 | first witness, Ms. Wade. |
| 16 | MS. WADE:  Thank you, Your Honor.  The Government |
| 17 | calls Officer Megan Fifer to the stand. |
| 18 | THE COURT:  Would you please come forward?  I'm going |
| 19 | to ask you to raise your right hand and be sworn by my clerk. |
| 20 | (The witness is sworn.) |
| 21 | THE COURT:  Thank you.  If you'd come right around |
| 22 | here and have a seat. |
| 23 | I'll remind everyone that we record, so please adjust your |
| 24 | microphones, including in the witness stand, so that you can |
| 25 | best be heard. |

Fifer - Direct                                    4

1        And Counsel, you may proceed.

2               MS. WADE:  Thank you.

3                 MEGAN FIFER, GOVERNMENT'S WITNESS, SWORN

4                          DIRECT EXAMINATION

5    BY MS. WADE:

6    Q    Will you please state your name for the record?

7    A    Officer Megan Fifer.

8    Q    And how are you currently employed?

9    A    I'm employed with the Fort Worth Police Department,

10   violent personal crimes, human trafficking unit.

11   Q    And are you a certified peace officer?

12   A    Yes, ma'am, I am.

13   Q    How long have you been a police officer?

14   A    Over six years.

15              THE COURT:  Can you pull it a little closer?

16              THE WITNESS:  Yes, sir.

17   BY MS. WADE:

18   Q    Thank you.  Have you participated in an investigation into

19   Elijah Muhammad and Ciara Davenport?

20   A    Yes, I have.

21   Q    Do you see the person that you've come to know as Elijah

22   Muhammad here in the courtroom today?

23   A    Yes.

24   Q    Can you please identify him by something he's wearing and

25   where he's seated?

1  A    He is in the orange striped jumpsuit to my left.

2  Q    And do you see the person that you came to know as Ciara

3  Davenport in the courtroom today?

4  A    Yes, I do.

5  Q    Can you please identify her by something she's wearing and

6  where she is seated?

7  A    Yes.  Second table to my left, orange striped jumpsuit.

8          MS. WADE:  May the record reflect this witness

9  identified both Defendants in open court?

10         THE COURT:  The record shall so reflect.

11  BY MS. WADE:

12  Q    And did you come to learn of a fentanyl investigation into

13  Elijah Muhammad as well as Ciara Davenport?

14  A    Yes, I did.

15  Q    And what did you know in regards to that investigation or

16  the happenings in that investigation before June 14th?

17  A    We had both of them on our radar for an ongoing

18  investigation into human trafficking.

19  Q    Can you move the mic or speak up just a little bit?

20  A    Yes.  I'm sorry.

21  Q    That's okay.

22  A    We had both of these subjects on our radar as far as the

23  human trafficking investigation.  I asked for a city pole cam

24  to be placed at one of the locations that we knew them to

25  frequent, which is the Days Inn hotel.  When I asked for that,

1    we were made aware of an ongoing narcotics investigation into

2    them as well.

3    Q    And what was your understanding of what had occurred

4    during that narcotics investigation?

5    A    I was informed that a confidential informant had been

6    purchasing fentanyl from them for over a year at their

7    residence and the Days Inn motel.

8    Q    And the residence -- the Days Inn motel, where is that

9    located?

10   A    It is located at 4213 South Freeway in Fort Worth, Texas.

11   Tarrant County.

12   Q    The residence that the confidential source was purchasing

13   the fentanyl and where both of these Defendants lived, what

14   city and county is that in?

15   A    That is in Forest Hill, Texas.  Tarrant County.

16   Q    So both within the Northern District of Texas?

17   A    Correct.

18   Q    And did that confidential source, to your understanding,

19   purchase fentanyl pills one time or more than one time?

20   A    More than one time.

21   Q    And what were the locations that they purchased those

22   from?

23   A    The Days Inn motel and also the residence in Forest Hill.

24   Q    And did that confidential source specifically say that

25   they had purchased fentanyl pills from the Defendant Elijah

Fifer - Direct                                7

1    Muhammad?

2    A    Yes.

3    Q    And did they indicate anything in regards to Ciara

4    Davenport?

5    A    They indicated that Ciara Davenport was also there at the

6    time that the fentanyl was purchased.

7    Q    And was she present and aware of the purchases?

8    A    Yes.

9    Q    Turning to the events of June 14, 2023, can you tell us

10   what happened on that date?

11   A    On June 14th, the confidential informant bought fentanyl

12   from Elijah Muhammad at the Days Inn motel.  The Days Inn

13   motel was in -- under surveillance, as well as their house.

14   Elijah left the Days Inn motel, went to his house, and the

15   officers came in, held the house, arrested Elijah on a traffic

16   stop when he was leaving the house, and then Kareem Muhammad

17   came to the house.

18   Q    And did detectives or officers in that narcotics

19   investigation receive a search warrant for the home?

20   A    Yes, they did.

21   Q    And you said that Elijah Muhammad was stopped on traffic.

22   Did he have some sort of warrant out of Fort Worth PD?

23   A    Yes.

24   Q    And is that what he was detained on?

25   A    Yes.

Fifer - Direct                                    8

1   Q    When the search warrant was run at the home in Forest

2   Hill, who was present at that point?

3   A    Ciara Davenport was there, with a small child.

4   Q    And how many children, to your knowledge, does Ciara

5   Davenport have?

6   A    Two.

7   Q    And is that with the Defendant, Elijah Muhammad?

8   A    I believe so, yes.

9   Q    And when the search warrant was being run at the house,

10  was Ciara Davenport in custody or detained at that point?

11  A    No.

12  Q    And when she -- and was she free to move about as she

13  wished?

14  A    Yes.

15  Q    Was she asked for consent to look into her cell phone?

16  A    Yes.

17  Q    Okay.  Did she give that consent?

18  A    Yes.

19  Q    And are you aware of what was located in her cell phone in

20  regards to the fentanyl pills?

21  A    I was made aware of messages indicating that Elijah sent

22  her, text messages, asking her to package up pills and that

23  someone would be picking them up in five minutes.

24  Q    And in that search of the residence that both of these

25  Defendants lived in, do you recall what was located in that

Fifer - Direct                                   9

1   home?

2   A    They located 82 grams of fentanyl, one ounce of marijuana,

3   and a .22 caliber handgun and fif... excuse me, $1,599 in

4   cash.

5   Q    And the 82 grams of fentanyl, was that in pill form?

6   A    Yes.

7   Q    Did it field-test positive for fentanyl?

8   A    Yes, it did.

9   Q    And where, if you know, was the fentanyl pills, where were

10  they kept in the home?

11  A    They were kept at ground level, behind the refrigerator,

12  in a plastic bag.

13  Q    And so the two children that these Defendants share, do

14  you know approximately how old they are?

15  A    They are under four years old.

16  Q    And so were these pills kept in a locked safe box,

17  anything of that nature, to your knowledge?

18  A    No.

19  Q    Were those pills kept within -- in a location where either

20  of these children could have access to them?

21  A    Yes.

22  Q    And to your knowledge, is this where both Defendants live

23  with these two young children?

24  A    Yes.

25  Q    And let's turn to your human trafficking investigation.

1  Overall, what is the total time frame that you are aware of in

2  regards to the trafficking investigation as it pertains to

3  Elijah Muhammad?

4  A    My unit was made aware of the first victim of Elijah

5  Muhammad in 2011.

6  Q    Were you guys notified of her in 2011, or the first victim

7  was from 2011?

8  A    The first victim was from 2011.

9  Q    And does that investigation indicate that the human

10 trafficking operation run by Elijah Muhammad was ongoing until

11 the present?

12 A    Yes.

13 Q    And in regards to Ciara Davenport, do you have any

14 information that she was involved in that human trafficking

15 organization?

16 A    Yes.  We believe so.  Narcotics officers, when they were

17 going through the consent search of her cell phone, found

18 messages indicating that she was advising Elijah Muhammad how

19 to word commercial sex acts, monetary and financial

20 transactions regarding those sex acts.

21 Q    And is there a term by which Ciara Davenport has referred

22 to herself and even Elijah Muhammad has referred to her as

23 that's significant in human trafficking?

24 A    Yes.  She is referred to as the top bitch.

25 Q    And in your training and experience, what significance

1   does that have?

2   A    In my training and experience in human trafficking

3   investigations, the top bitch, or sometimes commonly referred

4   as the bottom bitch, is the female that helps run the

5   trafficking enterprise, sometimes acts as a business manager

6   of sorts.

7   Q    And does Ciara have tattoos that are visible that also

8   indicate her connection with the human trafficking

9   organization?

10  A    Yes.

11  Q    And what are those?

12  A    On her right forearm, she has AOB, which means All on a

13  Bitch.

14  Q    And what does that mean, in your training and experience?

15  A    In my training and experience in human trafficking

16  investigations, that means that your money is made from

17  trafficking or prostitution.

18  Q    And then does she also have another tattoo in code that is

19  common in the human trafficking world?

20  A    Yes, ma'am.  She has 304 on her right forearm, which is

21  also code for ho.

22  Q    And in total, or approximately, how many victims, or is it

23  more than five, more than ten, so on, have you all identified

24  in this investigation?

25  A    As of the moment, we have over ten.

1   Q    Does that include juveniles as well as adults, or just

2   adults?

3   A    It includes juveniles.

4   Q    And does that -- is that limited to the Northern District

5   of Texas, to the State of Texas, something different?

6           MR. DANIELSON:  Your Honor, I'm going to object at

7   this point.  We have a drug case, not a prostitution or

8   solicitation case.

9           THE COURT:  Right.

10          MR. DANIELSON:  And all the testimony we're hearing

11  is about -- is from somebody who wasn't present at the drug

12  bust, I don't think.  And there's a lot of irrelevant

13  testimony here.

14          THE COURT:  Well, I understand that this is probably

15  being offered as to the issue of detention, not as to probable

16  cause for the charge, which she's already gone through.  So

17  I'm going to consider it for that purpose only, not as for

18  probable cause for a new offense.  So I'll overrule the

19  objection and you may continue.

20          MS. WADE:  Thank you, Your Honor.

21  BY MS. WADE:

22  Q    What is the, like, scope of travel for the human

23  trafficking operation?

24  A    We have victims identified in California and Texas.

25  Q    And based upon your investigation, was violence used as a

1    part of this human trafficking organization?

2    A    Yes.

3    Q    Are you able to give us any examples for times that you

4    are aware of that specifically involve either Elijah Muhammad

5    or Ciara Davenport?

6    A    Yes.  We have an adult victim that was pistol-whipped by

7    Elijah Muhammad and also pushed down stairs.

8         We have reports from Ciara Davenport where she was

9    assaulted by Elijah Muhammad.

10   Q    And you mentioned that this included juvenile victims as

11   well.  Has there been any issues or violence towards any of

12   the juveniles that you're aware of?

13   A    Yes.

14   Q    Okay.  And can you tell us about that?

15   A    In 2011, a juvenile victim was beaten and strangled by

16   Elijah Muhammad when she refused to perform commercial sex.

17   Q    And has there been any attempt at retaliation against any

18   of the girls who were being recruited or groomed or were

19   victims, to your knowledge?

20   A    Yes.

21   Q    And tell us about that.

22   A    One of the cooperating witnesses that we have was -- her

23   parents were assaulted several weeks ago in retaliation for

24   cooperating with us.

25   Q    And were specific words used to indicate that that was the

1   case, they were being retaliated against or --

2   A    Yes.

3   Q    And what were they called?

4   A    The mother of the victim, as she was being assaulted, was

5   being called a snitch.

6   Q    And did they suffer physical injuries from that?

7   A    Yes, ma'am.

8   Q    What kind of injury?

9   A    She had bruising to her face and a broken finger.

10  Q    And are you aware of Elijah Muhammad's criminal history?

11  A    Yes.

12  Q    As well as Ciara Davenport's?

13  A    Yes.

14  Q    And does that -- her -- Ciara's arrest in 2019 for

15  prostitution factor into your investigation?

16  A    Yes, it does.

17  Q    And kind of, in summary, how would you summarize Elijah

18  Muhammad's criminal history?

19  A    Very violent history.  We have several robbery charges on

20  his criminal history.  Parole violations.  Family violence,

21  including strangulation.  Multiple firearm offenses.  Rape

22  charges.  Pimping, prostitution charges.

23            MS. WADE:  Pass the witness.

24            THE COURT:  All right.  Cross-examination.  Mr.

25  White?

1                          CROSS-EXAMINATION

2     BY MR. WHITE:

3     Q    You mentioned a -- robbery charges in the past for Mr.

4     Muhammad.  Are you testifying that he's been convicted of

5     robbery?

6     A    They are on his criminal history.

7     Q    But no conviction?

8     A    Not that I can attest to at the moment.

9     Q    You didn't think that was something we would -- there's --

10    you understand there's a difference between an allegation and

11    a conviction, right?

12    A    Yes, sir.  I do.

13    Q    Okay.  And there's only allegations, correct?

14    A    Correct.

15    Q    All right.  You also said that there was a firearm charge.

16    You're aware, is there any conviction for a firearm charge, or

17    just an allegation?

18    A    I cannot speak to that.

19    Q    So you -- but you testified that there was a violent

20    history?

21    A    Correct.  We have family violence reports in Fort Worth.

22    Strangulations.  Assaults.

23    Q    Any convictions?

24    A    I believe some of those are still pending.

25    Q    So at this point, they are allegations?

1  A    Correct.  They're open investigations.

2  Q    At the -- so you were conducting a -- when did your human

3  trafficking investigation began for Muhammad, Mr. Elijah

4  Muhammad?

5  A    2019.

6  Q    So it began in 2019?  And when they came and executed the

7  search warrant and arrested Muhammad on the drug charges, did

8  you have what you believed to be probable cause to arrest him

9  for human trafficking?

10  A    It's an ongoing investigation at the moment.

11  Q    But did you have probable cause?  In your opinion, did you

12  have probable cause?

13  A    It -- it is a human trafficking investigation that we are

14  working with Homeland Security, and we are -- it's an ongoing

15  investigation at the moment.

16  Q    I understand.

17          MR. WHITE:  Objection.  Can you instruct the witness

18  to answer?

19          THE COURT:  Well, I guess he's asking, do you believe

20  you have probable cause at this point or are you still in your

21  investigation?

22          THE WITNESS:  We are still in our investigation.

23          THE COURT:  I think that answers your question, Mr.

24  White.  And your point is made.

25  BY MR. WHITE:

1    Q    So, despite every -- so, from -- from victims from 2011

2    from human trafficking, that's when the first victim was

3    reported to have been harmed by Mr. Muhammad, right?

4    A    Correct.

5    Q    And then you said you had some parents of a juvenile that

6    were assaulted in the last few weeks?

7    A    Yes, sir.

8    Q    Okay.  Did you take them to be credible?

9    A    Yes.  Yes, sir.

10   Q    And -- but you still didn't believe that developed

11   probable cause to arrest him for anything?

12   A    We are still in our investigation.

13   Q    With regard to the cell phone messages that you received

14   -- that you believe you received from Ms. Davenport -- well,

15   let me ask you this.  Were you there at the search of the home

16   on Forest Hill?

17   A    No, sir, --

18   Q    In Forest Hill?

19   A    -- I was not.

20   Q    So did you look at the phone from Ms. -- Ms. Davenport's

21   phone yet?

22   A    No, sir, I did not receive consent.

23   Q    Have you examined the records, the call records from it?

24   A    It is currently at the digital forensics unit.

25   Q    Do you -- was there a phone number in there for Mr.

Fifer - Cross                                    18

1    Muhammad or -- Mr. Muhammad?

2    A    Not that I'm aware.

3    Q    So how did we identify that the messages coming in and out

4    of that phone were from Mr. Muhammad?

5    A    On the screen shot that I have seen from the search

6    warrant photos, the incoming messages, it is Elijah Muhammad's

7    email address at the top.

8    Q    Okay.  And do you -- in your investigation, have you

9    developed and/or seen other instances of Mr. Muhammad using

10   that email address at the top of that cell phone?

11   A    Not currently.

12   Q    So anyone could have created that email address?

13   A    It's possible.

14   Q    Could have been mine.  Right?

15   A    It's possible.

16   Q    And we've not connected that email address to Mr. Muhammad

17   in any way, shape, form, or fashion?

18   A    We're still in that part of the investigation.

19   Q    Your -- you said your confidential informant purchased on

20   how many occasions?

21   A    Over the course of a year.

22   Q    Approximately how many occasions?

23   A    I do not know that information.

24   Q    Tell us about your reliability for your confidential

25   informant.  You indicated that he or she was reliable.  What

1    did you develop with regard to her reliability prior to using

2    her -- him or her to develop probable cause?

3    A    The confidential informant was working with our narcotics

4    unit, and they have a process in which they vet their

5    confidential informants.  So I cannot speak to the specifics

6    of that.

7              MR. WHITE:  May I have just a moment, Your Honor?

8              THE COURT:  You may.

9         (Pause.)

10             MR. WHITE:  I will pass the witness.

11             THE COURT:  Okay.  Mr. Danielson, cross-examination?

12             MR. DANIELSON:  Thank you, Your Honor.

13                          CROSS-EXAMINATION

14   BY MR. DANIELSON:

15   Q    Are Elijah and Kareem both subjects of this human

16   trafficking investigation?

17   A    Yes, sir.

18   Q    Is that what you meant when you said they were both on our

19   radar for human trafficking?

20   A    Yes, sir.

21   Q    The -- there were pole cams from the Days Inn on 35,

22   right?

23   A    Yes, sir.

24   Q    Have you watched any of that video?

25   A    Yes, sir, I have.

1  Q    And were those cameras focused on one or two rooms?  Or

2  three?  Do you know how many rooms they were focused on?

3  A    The camera is able to be moved and zoomed in so we can

4  focus on multiple rooms, up to the entire hotel if we needed

5  to.

6  Q    How many rooms were the subject of the investigation?

7  A    As far as I'm aware of, we have up to four to five rooms

8  at a time.

9  Q    Kind of near each other?

10  A    Yes, sir.

11  Q    Do you -- did you ever see on those videos Ms. Davenport

12  going in -- in or out of any of those rooms?

13  A    Not on any of the cameras that I have seen.

14  Q    You said on June 14th there was a buy from Elijah at the

15  Days Inn.  Ms. Davenport was not present for that, correct?

16  A    Not that I'm aware of.

17  Q    At the house, you said the client was -- or that, I'm

18  sorry, that Ms. Davenport was free to move.  You were not

19  present there?

20  A    Correct.

21  Q    You do not know what was said to her to get her to do

22  things like opening the phone?

23  A    Correct.

24  Q    Do you know, had she said, I'm leaving, would they have

25  let her leave?

1   A    I believe so.  As far as I'm aware of, they said that she

2   was not detained and was free to move.

3   Q    Free to move, but was she free to leave?  Had she said,

4   I'm going, and picked up her baby and walked out and started

5   walking down the street, would they have let her leave?

6   A    I can't speak to that.

7   Q    So, on what do you base your belief that she was free to

8   move about?

9   A    The credible statement from another law enforcement

10  officer.

11  Q    Okay.  Would her statement to the effect that she did not

12  believe that she could leave mean anything to you?

13  A    I would take that into consideration.

14  Q    Okay.  Have you seen photos from that search of the house?

15  A    Yes, sir, I have.

16  Q    Have you seen bags of her clothes in the garage?

17  A    Yes, sir, I have.

18  Q    And after -- after the search, they were just all strewn

19  around the garage, right?  The bags were just torn open?

20  A    I believe so, yes.

21  Q    Okay.  Were there any of her clothes in a dresser in a

22  bedroom?

23  A    I did not see any photos of a dresser or a bedroom.

24  Q    What evidence was there that Ms. Davenport was actually

25  living there?

1   A   Her presence at the residence.  And I believe her

2   statements to the other officers.  Her vehicle was also parked

3   in the driveway.

4   Q   Which would be consistent with her visiting there and

5   having --

6   A   Could be.

7   Q   -- left some stuff in his garage?

8   A   Correct.

9   Q   You -- now, you referenced a couple of her tattoos.  And

10   you know Ms. Davenport has had a particularly difficult past,

11   --

12   A   Yes.

13   Q   -- in terms of the abuse she suffered as a child and as a

14   teenager?

15   A   Yes, sir.

16   Q   The description that you make in terms of her involvement

17   with this trafficking stuff really just -- you described her

18   as a victim when -- when you talk about specific activity of

19   abuse, when you were talking about Mr. Muhammad, that there

20   was allegations of abuse against Ms. Davenport.  There's no

21   allegations of her abusing somebody else, correct?

22   A   Not that I'm aware of.

23   Q   You said there was a mother of a victim who was assaulted.

24   Where did that occur?

25   A   That occurred in Fort Worth, Texas.

1    Q    Do you know who did it?

2    A    I do.

3    Q    Who did that?

4    A    It is Kareem's son's friend.  The mother of his friend.

5    Q    Okay.  So the connection is to Elijah's brother -- to a

6    friend connected to Elijah's brother?

7    A    Correct.

8    Q    Okay.

9    A    And that friend is also currently, we believe, selling

10   narcotics for both brothers.

11   Q    Is there anything connecting that person directly to Ms.

12   Davenport?

13   A    No.  Not that I'm aware of.

14   Q    You referenced a prostitution arrest that Ms. Davenport

15   had in 2019.  Are you aware that what she actually ended up

16   pleading guilty to was disorderly conduct?

17   A    No.

18   Q    And she received a deferred sentence of six months from

19   that.  Is that correct?  Are you --

20   A    I'm not aware of that, but --

21   Q    Okay.  So all that you know is that she was charged with

22   prostitution at some point?

23   A    Correct.

24   Q    What -- at this -- when Ms. Davenport was arrested, what

25   kind of vehicle was it that was in the driveway?

Fifer - Cross                                    24

1    A    I believe it was a black Nissan Altima.

2    Q    I'm talking about, I'm sorry, I'm talking about when the

3    raid -- when the search occurred at the house.

4    A    Correct.

5    Q    Was it --

6    A    Um, --

7    Q    It was a black Nissan?

8    A    I believe so.

9    Q    That's the same vehicle that Mr. Muhammad was arrested in

10   driving away from the house, correct?

11   A    I'm unaware of that.  I wasn't at the -- at the traffic

12   stop, so --

13   Q    Okay.  And have you seen the police reports of the traffic

14   stop?

15   A    I have briefly looked at them.

16   Q    The --

17        MR. DANIELSON:  May I have just a moment, Your Honor?

18        THE COURT:  You may.

19        (Pause.)

20   BY MR. DANIELSON:

21   Q    In the complaint, Page 4 and Page 5, Paragraph 9 says that

22   Elijah Muhammad was arrested driving away in a black Nissan

23   sedan and that Kareem arrived in a black Dodge truck and that

24   he was arrested leaving in that truck.  So the Nissan was not

25   in the driveway when that -- when that raid happened.

1  Correct?

2  A    Correct.   The Nissan was in the driveway when we arrested

3  her several days later.

4  Q    Okay.

5           MR. DANIELSON:  Pass the witness, Your Honor.

6           THE COURT:  All right.  Anything further for this

7  witness?

8           MS. WADE:  Just briefly.

9                        REDIRECT EXAMINATION

10  BY MS. WADE:

11  Q    In regards to Ciara Davenport -- I may have asked this, so

12  forgive me if I have -- but per your investigation, how long

13  has she been involved in the human trafficking organization?

14  A    Our first notification of that was 2018.

15  Q    And is it uncommon for someone to begin as a victim of

16  trafficking and then turn into a manager and participant in

17  the trafficking?

18  A    Very common.

19  Q    And did you arrest her at this same residence that the

20  search warrant was run at?

21  A    Yes.

22  Q    Several days later?

23  A    Yes.

24           MS. WADE:  No further questions, Your Honor.

25           THE COURT:  All right.  Thank you.  You may step

1    down.

2              THE WITNESS:  Thank you, sir.

3         (The witness steps down.)

4              THE COURT:  Additional evidence from the Government

5    at this time?

6              MS. WADE:  I would just ask the Court to take

7    judicial notice of the Pretrial Services report for each

8    Defendant, and I would rest, Your Honor.

9              THE COURT:  All right.  Mr. White, do you have any

10   evidence you wish to offer as to the issues of probable cause

11   or detention at this time?

12             MR. WHITE:  With regard to detention, I would call

13   Susan Worline.

14             THE COURT:  Okay.  Susan Worline?

15             MR. WHITE:  Worline.  Yes, Your Honor.

16             THE COURT:  Thank you.

17             MR. WHITE:  W-O-R -- W-O-R-L-I-N-E, I believe.

18             THE COURT:  Got it.  Thank you so much.

19             MR. DANIELSON:  Your Honor, just so you know, we're

20   both intending to call Ms. Worline.

21             THE COURT:  I assumed so, so I will give you an

22   opportunity as well.

23             MR. DANIELSON:  Okay.

24             THE COURT:  All right.  Ms. Worline, if you would

25   please just come forward.  Let me let you step up here and get

1    situated, and then I'll swear you in.  There you go.  Be

2    careful.

3        Before you sit down, could you raise your right hand and

4    be sworn by my clerk?

5        (The witness is sworn.)

6            THE COURT:  Thank you.  If you would, be seated.  And

7    you probably heard me say earlier, we record.

8            THE WITNESS:  Right.

9            THE COURT:  So when you get settled, if you want to

10   pull that microphone closer so we can all hear you, we would

11   appreciate that.

12       Mr. White, you may proceed.

13           SUSAN WORLINE, DEFENDANTS' WITNESS, SWORN

14                      DIRECT EXAMINATION

15   BY MR. WHITE:

16   Q   Ms. Worline, where do you -- where do you live?

17   A   I live in Mansfield, Texas.

18   Q   Okay.  How long have you lived there in Mansfield?

19   A   Eighteen years.

20   Q   Okay.  How do you know this gentleman sitting next to me?

21   A   He's my son.

22   Q   So I assume you've known him his entire life?

23   A   Absolutely.

24   Q   How long has he lived here in the Dallas-Fort Worth area?

25   A   Since like 2016, I believe, is when he came.

1  Q    And where did he come from?

2  A    California.  We're all from California.  But I --

3           THE COURT:  Can you pull it a little closer?  We've

4  just got to make sure it's recording.

5           THE WITNESS:  Okay.  Can you hear me?

6           THE COURT:  Oh, there you go.  Yes.

7           THE WITNESS:  I'm sorry.  Ask me again.

8  BY MR. WHITE:

9  Q    You said he had been here since 2016, correct?

10 A    About, yeah, 2016.

11 Q    And where did he -- where did he come from?

12 A    From California.

13 Q    And since he's been here in 2017, has he had jobs and

14 things of the sort?

15 A    Oh, yeah.  Oh, yeah.

16 Q    What type of work has he done?

17 A    He's done warehouse jobs.  He had one for a long time,

18 especially when he first came.  He's done delivery jobs.  He's

19 driven a truck, you know, with a trailer, because he doesn't

20 have his CDL yet.  So, and so he's done a lot of delivery.

21 He's done handy jobs.  There's apps that he's worked on.  So

22 he's been working.

23 Q    Does he have -- is he married?

24 A    No, he's not married.

25 Q    Children?

```
 1    A    Yes.

 2    Q    How many?

 3    A    Two.

 4    Q    How old?

 5    A    Well, he has four children, but the two that are here, my

 6    granddaughters, they're --

 7    Q    So the two that are here are --

 8    A    Uh-huh.

 9    Q    -- little girls?

10    A    Right.   The two girls.

11    Q    Okay.

12    A    They're one and three.

13    Q    What type of father is he?

14    A    He's an excellent father.   They love him.   He takes good

15    care of them, makes sure they're clean, safe.   And he takes

16    them places.   You know, Malia, she's older, so she's been, you

17    know, to California to see our other relatives and stuff.   You

18    know.   And he's a good dad.   He has pizza night.   He had Taco

19    Tuesday night.   He always spends time with them and takes them

20    places on the weekend.   He does.   And he's a good father.   And

21    they love him.   And they --

22    Q    Where --

23    A    -- miss him.

24    Q    Where do the -- where do the children live?

25    A    They live with me now.
```

1   Q   Where were they living at prior to his arrest?

2   A   With him.

3   Q   Okay.  Who else was living there?

4   A   With him?

5   Q   Yes.

6   A   Ciara was there.

7   Q   Now, you mentioned that the children are living there with

8   you.

9   A   Right.

10  Q   Okay.  If --

11  A   And I have the kids -- I'm sorry.

12  Q   If he were to be released, would he be allowed to stay

13  there with you?

14  A   Yes, sir.  I have a four-bedroom house and I live by

15  myself.

16  Q   Considering any sort of technology concerns, whether it's

17  phone, internet, or whatever, if they were to put some sort of

18  an electronic monitor on him, would you allow them to install

19  whatever hardware necessary in your home to make sure that he

20  would not leave the home?

21  A   Certainly.

22  Q   Okay.

23  A   Yes.  Of course.

24  Q   Would you make sure to -- make sure he got back and forth

25  to court and to any court-related appointments --

1    A    Yes.

2    Q    -- if they -- if the judge -- if the Court were to release

3    him?

4    A    Yes.  Of course.  Yes.

5    Q    How -- would you make sure that he stayed out of trouble

6    and not been involved in any additional criminal activity?

7    A    Yes.  I would.  Definitely.

8    Q    How would you go about doing so?

9    A    Well, first of all, if he came home, he would be staying

10   at home, because he couldn't get a job because I know he has

11   to go back and forth to court.  So he would be staying home.

12   The girls are there.  You know, Malia.  He would be able to

13   assist me, because, you know, it's a lot for me right now, I

14   have a bad hip, taking care of the kids, and it would be

15   beneficial.  He could take Malia to school for me, or watch

16   ZZ, because I still work from home.  You know.  And it's just

17   really, really hard right now.

18   Q    Who else lives with you in that home?

19   A    Well, nobody right now, but I am going to -- Ciara's

20   grandmother, the kids' great-grandmother, we have been friends

21   over the years.  So now, since this happened, she's coming

22   also to my house to live, to stay, until we can work this out

23   and see what's going to happen.  So she will be there.  She's

24   supposed to arrive on Monday.

25            MR. WHITE:  I'll pass the witness.

1          THE COURT:  Mr. Danielson, questions for the witness?

2          MR. DANIELSON:  Yes.

3                          DIRECT EXAMINATION

4    BY MR. DANIELSON:

5    Q    Ms. Worline, I'm going to ask you some of the same

6    questions about --

7    A    Uh-huh.

8    Q    -- about Ciara.  If Ciara was released, would she be able

9    to live with you?

10   A    Oh, yes.

11   Q    And you have -- the two girls are staying with you right

12   now?

13   A    Yes, sir.

14   Q    And as a mother, is Ciara attentive to her -- to the kids?

15   A    Oh, yes, she's an excellent mother.

16   Q    All right.

17   A    They love her, yeah.

18   Q    And as far as all the questions about getting to court and

19   following the rules, would the same be true with Ciara?

20   A    Oh, yes.

21   Q    Have you --

22   A    Of course.

23   Q    How long have you known Ciara?

24   A    Since about five years.

25   Q    All right.

1    A    Uh-huh.

2    Q    Is she --

3    A    She's a good mother.  She's been a good girl.  I haven't

4    seen her do anything that I wouldn't want my daughter to do.

5    Q    Okay.

6    A    You know.

7    Q    You've kind of true to her as a daughter --

8    A    Absolutely.

9    Q    Okay.

10   A    She is just like my daughter.

11   Q    If -- describe how -- describe how you are with rules.  I

12   know we've talked about that briefly.

13   A    Well, you know, I'm -- I'm an older person.  I'm in my

14   sixties.  And I have a set of values that I live by.  So

15   anyone living in my house has to abide by the rules.  You

16   know, I don't have people -- I don't have a lot of people

17   coming to my house.  I -- since I have to have hip surgery

18   now, I'm at home a lot, but I don't go a lot of places.  I

19   don't have a lot of company.  You know, like I have the

20   grandkids every weekend.  I make sure, you know, I spend time

21   with them.  And we do things at home.  We bake cookies.  You

22   know, they have all -- so those are the kind of things that we

23   do.

24        And so I -- and at my house, like I said, I had my

25   grandson there, you know, and he was able to graduate from

1    high school and everything.  So I have rules and I don't play

2    games at this point.

3    Q    Your experience is that you would expect Ciara to follow

4    your rules?

5    A    Oh, yeah.  And I know she would.  She has lived with me

6    before.

7    Q    And if there was an issue in a -- in an order, if there

8    was something she was ordered to do and she didn't do it,

9    would you have any trouble calling the probation officer and

10   letting them know?

11   A    No.  Not at this point.  Not at all.

12             MR. DANIELSON:  I'll pass the witness, Your Honor.

13             THE COURT:  All right.

14             THE WITNESS:  Yeah.

15             THE COURT:  Cross-examination?

16             MS. WADE:  Yes, Your Honor.

17                          CROSS-EXAMINATION

18   BY MS. WADE:

19   Q    Ms. Worline?

20   A    Yes.  That's it.

21   Q    The house in Forest Hill, is that where Elijah, Ciara, and

22   their kiddos live?

23   A    Well, they -- they -- no.  That house, they just moved in

24   now.  It's been a week.  Elijah moved in the house.  And then

25   Ciara came.  And they only been in the house like a week, a

1   week and a half.

2   Q    And who owns that house?

3   A    I don't know who owns it.

4   Q    Are they renting it or did they buy it?

5   A    They were renting it.

6   Q    And you said they've only -- so when did they move in?

7   A    Yeah.  About, like I said, a couple of weeks ago.

8        (Interruption.)

9            THE COURT:  Sir.

10           THE WITNESS:  And I --

11           THE COURT:  Hold on just a moment.  Sir, you've got

12  to stop talking.

13           DEFENDANT MUHAMMAD:  He needs to object to this type

14  of stuff, because she don't know nothing.

15           THE WITNESS:  Yeah.  I don't know --

16           THE COURT:  Mr. Muhammad, --

17           THE WITNESS:  -- who owns the house.

18           THE COURT:  -- what's wrong with you, sir?  Are --

19           DEFENDANT MUHAMMAD:  Because that she --

20           A VOICE:  Elijah.

21           THE COURT:  Hold on.

22           DEFENDANT MUHAMMAD:  No, he's asking me a question.

23           THE COURT:  I did ask you a question.

24           DEFENDANT MUHAMMAD:  This is my mother.

25           THE COURT:  Yes.

1          DEFENDANT MUHAMMAD:  She does not -- there's certain

2     things she -- she just -- certain things she was -- she's not

3     told about and stuff.

4          THE COURT:  And she can certainly say, I don't know

5     the answer to that.  And if she answer -- I'll take her answer

6     for what it is.  So why don't you just sit quiet and let us

7     have this hearing.

8          DEFENDANT MUHAMMAD:  Okay.  Can --

9          THE COURT:  Do you understand?

10         DEFENDANT MUHAMMAD:  Can I answer it?  Just because I

11    see a lot of manipulative stuff going on.

12         THE COURT:  She is able --

13         DEFENDANT MUHAMMAD:  And I don't -- if this is on her

14    word, --

15         THE COURT:  You -- you called her as a witness and

16    they're entitled to ask questions of the witness.  If it --

17         DEFENDANT MUHAMMAD:  She ought to say she don't know,

18    sir.

19         THE COURT:  All right.

20         DEFENDANT MUHAMMAD:  That --

21         THE COURT:  Just -- just stay quiet.  Thank you.

22      Continue so we can finish this hearing, please.

23         MS. WADE:  Thank you, Your Honor.

24    BY MS. WADE:

25    Q    I'm sorry.  You were saying when did they move into that

1  house?

2  A    It was -- they didn't move in.  He moved in there.  I

3  don't know who owns it, and I don't know who the other --

4  other people are.  I just know about him.

5  Q    So when did he move in?

6  A    It was a couple of weeks ago.

7  Q    Okay.  And you told Pretrial Services he doesn't have

8  stable employment.  Is that right?

9  A    No, I said that he's self-employed.

10 Q    So, --

11 A    He doesn't have a W-2 job.

12 Q    Okay.

13 A    That's what I said.

14 Q    So when they say that you said he has no stable employment

15 and is trying to purchase -- purchase a truck, that's not

16 accurate?

17 A    No, I said that he's self -- well, I -- that's how they

18 put it.  He's self-employed.  He does deliveries.  You know,

19 he does a lot of different things that were legal.  I don't

20 know anything about this.  But he did do things, you know, he

21 got to make money.  He has a family.  And he has some goals to

22 eventually be a truck driver.

23 Q    And Ciara just stays at home with the kids, correct?

24 A    She was -- she was staying-at-home mom, yes.

25 Q    And do you know what -- do you know what fentanyl is?

1    A    Yes, I've seen the news.  I know exactly what it is.

2    Q    And you know how dangerous it is?

3    A    Yes, I know.

4    Q    And you --

5    A    It's --

6    Q    You would agree with me that keeping fentanyl pills on the

7    ground where a one-year-old and a three-year-old could get to

8    them, that's very dangerous?

9    A    Well, I would not do that.  But I don't -- I don't know if

10   they really had pills in the house, so I can't speak on that.

11   I've never seen them dealing drugs.

12   Q    And that wasn't my question.  My question was --

13   A    I know.

14   Q    -- you wouldn't do that, right?

15   A    No, I wouldn't.

16   Q    Okay.  And it was your house where a 16-year-old runaway

17   was recovered from; is that right?

18   A    That was Jaden's girlfriend.

19   Q    And she came --

20   A    I didn't know she was a runaway until they came and told

21   me that.

22   Q    And she was from California; is that right?

23   A    Right.  We're all from California.

24   Q    And do you -- when was the last time you spoke with

25   Kareem?

1  A    I spoke with Kareem about four days ago.  Four or five

2  days ago.

3  Q    And do you know where he's at right now?

4  A    No, I don't.

5          MS. WADE:  Pass the witness.

6          THE COURT:  All right.  Anything further for the

7  witness, Mr. White?

8          MR. WHITE:  No, Your Honor.

9          THE COURT:  Mr. Danielson?

10          MR. DANIELSON:  No, Your Honor.

11          THE COURT:  Thank you, ma'am.  You may step down.

12          THE WITNESS:  All right.  Thank you.

13          THE COURT:  Thank you for being here today.

14          THE WITNESS:  All right.

15      (The witness steps down.)

16          THE COURT:  Additional evidence by witness or proffer

17  from Mr. White?

18          MR. WHITE:  No, Your Honor.

19          THE COURT:  Mr. Danielson?

20          MR. DANIELSON:  No, Your Honor.

21          THE COURT:  All right.  Any rebuttal evidence -- oh,

22  please be careful.  Take your time there.  Yeah, it's all

23  right.  We'll help you down there.

24      Any rebuttal evidence from the Government?

25          MS. WADE:  No, Your Honor.

1          THE COURT:  All right.  The evidence is closed.  Do

2     you wish to be heard in summation, Ms. Wade?

3          MS. WADE:  Yes, Your Honor, I do.

4     So, in regards to the probable cause, as Officer Fifer

5     testified, there was a confidential source who, on more than

6     one occasion, bought fentanyl pills directly from Elijah

7     Muhammad, with Ciara Davenport present and aware that those

8     pills were being purchased.

9          There is a text message in Ciara Davenport's phone between

10    her and Elijah Muhammad where he is directing her to prepare

11    the pills for packaging and selling.

12         And in addition to that, when a search warrant was

13    conducted at the residence where they both lived, in that home

14    82 grams of fentanyl was located, along with a firearm and

15    cash.  And so -- and that residence was in the Northern

16    District of Texas.

17         And so, for those reasons, we believe we've met probable

18    cause.

19         In regards to detention, Your Honor, first, for Elijah

20    Muhammad, one, his criminal history for arrests and charges is

21    pretty outstanding.  And two, defense attorney's point, he has

22    been convicted of a hit and run causing death or injury.  He

23    has been convicted of a robbery, a threatened crime with

24    intent to terrorize.  He -- or, I'm sorry, just of robbery,

25    not the threatened a crime.

1    He was revoked on that probation because he was not

2    complying with his conditions.

3    In addition to that, he had an inflict willful injury to a

4    spouse, of which he was placed on probation and revoked

5    because he could not follow those conditions.  He was

6    sentenced to four years in prison in California for his

7    violation of parole.  He's been arrested numerous times for

8    pimping, though unfortunately those cases were all dismissed.

9    And in 2021 he pled to a felony, assault of a family member,

10   with a previous conviction, and placed on four years' deferred

11   probation, which means that he's currently on probation for a

12   felony offense out of the State of Texas.

13   So, aside from the fact that he is dealing drugs and has

14   dealt fentanyl pills for approximately a year, and the fact

15   that there is an ongoing human trafficking investigation into

16   his organization that has been running since at least 2011,

17   with more than ten victims, including juveniles and adults,

18   with victims stating that they've been pistol-whipped by him,

19   strangled, and et cetera, Your Honor, for all of those

20   reasons, this Defendant is a danger to the community, he is a

21   risk of flight, and he absolutely should be detained.

22   In regards to Ciara Davenport, she is a stay-at-home mom

23   living in a residence at which fentanyl pills were placed

24   carelessly behind a refrigerator where her one-year-old and

25   three-year-old could easily get them.  At those ages, children

1    put everything in their mouth.  At those ages, children are

2    curious about everything.  At those ages, children are mobile

3    and moving around, and ground level is perfect for a one-year-

4    old to be curious as to what things are.

5        In addition to that, there was a firearm in that home with

6    those children, and she was a part of the distribution of the

7    pills.

8        In addition to that, she admitted to using marijuana just

9    four days ago, and presumably that's in the home with these

10   children.  And it is still illegal in the State of Texas for

11   that to happen.

12       So the children are in danger with Ciara Davenport being

13   around.

14       In addition to that, we have testimony that she has moved

15   from possibly being a victim at one point to now being a

16   manager in this human trafficking organization, as signified

17   by the fact that she has tattooed herself with 304 and with

18   AOB.

19       In addition to that, text messages indicate that she is

20   telling Elijah Muhammad about wording sex ads, pricing, and

21   things of that nature regarding the commercial sex

22   organization or human trafficking organization that they are

23   running, Your Honor.

24       And so while her childhood may have been awful and while

25   she may have started as a victim, once you cross that line

1  into participating in the organization and being what is --

2  how they refer to her as a top bitch, then you've stepped over

3  into another side of that and you've now become a trafficker.

4  And now you are a danger to yourself, to others in this

5  community, and a risk of flight.

6       And so for those reasons we believe she should be detained

7  as well.

8            THE COURT:  All right.  Mr. White, do you wish to be

9  heard in summation?

10           MR. WHITE:  Yes, Your Honor, very briefly.

11      With regard to -- the real issue now is whether or not

12  there is a set of conditions that will prevent him from

13  flight, running off, and protect the community.  Right?  But

14  let's real briefly just kind of address the human trafficking

15  that we were -- spent most of the time talking about.  Right?

16  They've been investigating this guy since maybe 2011, two --

17  some -- some -- many years, right?  But as law enforcement

18  officers, what they've laid out, we all know what's probable

19  cause.  You know, you've got credible people alleging that he

20  beat them in retaliation of some sort of sex ring.  Okay?  But

21  as sworn law enforcement officers, as sworn law enforcement

22  officers with a duty to protect the public, they did not

23  arrest him.  They did not arrest him.

24      Therefore, that is ample evidence to say he's not a

25  continuing danger, nor is he going to run off.  Because if he

1    -- if he were, they would have had a duty to protect the

2    public by arresting him.  They would have had a duty to

3    protect their case by not letting him run off and take him

4    into custody.

5        They didn't do it, and it's disingenuous for them to come

6    in here today and say, well, all of a sudden he's a danger to

7    the community.  All of a sudden, he's a flight risk.  Was he a

8    flight risk in -- they started in 2011.  Was he a flight risk

9    in 2012?  '13?  '14?  '15?  No, he wasn't a flight risk.  He

10   wasn't a continuing danger.  Right?

11       So, that being said, are there a set of conditions that

12   will prevent him from running off?  Yes.  Home arrest.  I

13   mean, home confinement with an electronic monitor.  That fixes

14   this.  That fixes this.  Home confinement with a set of --

15   with a set of -- with an electronic monitor.  He'll be there.

16   And we can limit his ability to interact with the outside

17   world.  And so therefore we would submit that there are a set

18   of conditions that would prevent him from being a flight risk

19   and a continuing danger to the community.  Therefore, he

20   should be released.

21            THE COURT:  All right.  Thank you.  Mr. Danielson?

22            MR. DANIELSON:  Judge, Ms. Davenport, first of all,

23   the Government asked the Court to accept the Pretrial Services

24   report.  We also do.  In particular, the recommendations as to

25   Ms. Davenport, that she be released on certain conditions.  I

1   do believe that conditions are appropriate in this situations.

2       Much was made about the fact that she smoked marijuana.

3   She also drinks alcohol.  She has a long history of evaluation

4   and diagnosis stemming from a lot of incidents in her

5   childhood.  And she has occasionally used marijuana to self-

6   medicate, because when she turned 18 she was basically dumped

7   out of the system, lost all services that she had been

8   receiving from about the age of nine.

9       She -- in fact, it happened two weeks before she would

10  have graduated from high school, but she was in a state group

11  home, but because she was 18 she was not -- she was -- she had

12  to leave on her 18th birthday, and because of that was not

13  able to finish high school.  She's been trying to deal with

14  that since, and in some ways life hasn't gotten any

15  particularly easier.

16      However, even in terms of this marijuana use, the way she

17  has described it to me is that she would only use that once

18  the kids were in bed and she could go outside.  I don't

19  condone it, but I think that's significantly different than

20  some of the other things.

21      I don't know, I don't have any information about where

22  drugs were actually kept, but if they were kept behind a

23  refrigerator, I have yet to see the three-year-old who could

24  move a refrigerator to get to the drugs, and certainly not a

25  one-year-old, to get behind a refrigerator.  And I don't have

1   any information other than the Government's assertion on that.

2          Simply put, she's a victim of a lot of things, and even --

3   even the evidence purporting her involvement in this

4   trafficking thing shows her much more of a victim than as a

5   user.  There's no evidence that she was involved in threats or

6   abuse of other people.

7          And it's always frustrating when the only witness in a

8   detention hearing is a person who knows nothing about the case

9   that we're actually here about.  And so, you know, all of the

10  evidence we've heard is the statements from somebody who

11  doesn't know anything about the drug case but knows about an

12  unrelated investigation.

13         So, but I think the Pretrial Services report is correct

14  that there are conditions that can appropriately protect the

15  community.  From here, it's pretty apparent from all the

16  evidence that any of -- any of the allegations that have been

17  made this morning were not through and by Ms. Davenport, that

18  she is, in some way, I don't mean this in a legal sense, but

19  in some way she's a captive in this situation.  And I think

20  that it would be appropriate for her to be staying with Ms.

21  Worline, who, from our conversations, appears to be a person

22  who knows how to manage a home.  The other grandson who was

23  referenced, it sounds like he is doing well as an adult and

24  was -- was raised well.  So I do think that conditions are --

25  would be appropriate.

```
1              THE COURT:  All right.  Thank you, Mr. Danielson.
2        Any final word from the Government?
3              MS. WADE:  No, Your Honor.
4              THE COURT:  All right.  Well, the charge before the
5    Court set forth in the criminal complaint is a drug
6    conspiracy, and so I find probable cause as to that charge has
7    been met.
8        As to the issue of detention, I find that each of the
9    Defendants does present a risk of flight or nonappearance, but
10   more importantly, a danger to the community unless detained.
11   I'm going to order that each Defendant will remain in the
12   custody of the United States Marshal while this case is
13   pending.
14       Are there any other matters to consider in connection with
15   the Defendants before the Court?  From the Government?
16             MS. WADE:  No, Your Honor.
17             THE COURT:  From the Defense?
18             MR. WHITE:  No, your honor.
19             THE COURT:  From the Defense?
20             MR. DANIELSON:  No, Your Honor.
21             THE COURT:  All right.  Both of you need to check
22   your attitudes a little bit.  You both came in running hot.
23   I've given you two of the best lawyers on our panel, and you
24   need to --
25             DEFENDANT MUHAMMAD:  I apologize.
```

1          THE COURT:  Oh, that's okay, and I appreciate that.

2    And I will accept that.  But please work with the two

3    attorneys I've given you to help guide you through this.  This

4    isn't state court.  This isn't minor league.  So you need to

5    trust some expertise I've given you in advising you.  So I

6    just give you that, just I hope you take it to heart.

7        All right.  Anything further from the Government?

8          MS. WADE:  No, Your Honor.

9          THE COURT:  All right.  The Defendants are remanded

10   to the custody of the Marshal.  The attorneys are excused.

11   Thank you all.

12       (Proceedings concluded at 10:44 a.m.)

13                              --oOo--

14

15

16

17

18

19

20                          CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording in the above-entitled matter.
22
     **/s/ Kathy Rehling**                          **09/01/2023**
23
24   _____        _____
     Kathy Rehling, CETD-444                         Date
25   Certified Electronic Court Transcriber

INDEX

PROCEEDINGS                                                        3

WITNESSES

| Government's Witnesses | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Megan Fifer | 4 | 15/19 | 25 | |

| Defendants' Witnesses | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Susan Worline | 27/32 | 34 | | |

EXHIBITS

-none-

RULING                                                           47

END OF PROCEEDINGS                                               48

INDEX                                                            49